UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

B.K. AND Y.K., INDIVIDUALLY AND ON
BEHALF OF G.K.,

Plaintiffs,

-against-

NEW YORK CITY DEPARTMENT OF
EDUCATION,

Defendant.

------------------------------------------------------------------X

I COURT FILED

MAR 3 1 2014

BROOKLYN OFF

**MEMORANDUM AND ORDER**

**13-CV-00393 (NGG) (CLP)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs B.K. and Y.K. (the "Parents") bring this action against the New York City

Department of Education ("Defendant" or "Department") on behalf of their son, G.K.

(collectively with Parents, "Plaintiffs"), who is diagnosed as having an Autism Spectrum

Disorder and presents with significant delays in cognitive, adaptive, and interpersonal skills.

Plaintiffs contend the Department failed to offer G.K. a free and appropriate public education for

the 2011-2012 school year as required under the Individuals with Disabilities Education

Improvement Act (the "IDEIA"), 20 U.S.C. § 1400 et seq.[1]  Plaintiffs move for summary

judgment seeking reversal of an administrative decision denying their claim for tuition

reimbursement for G.K.'s private special education program during the 2011-2012 school year

and direct funding for 10 hours per week of home-based therapy, among other relief.  (Pl.'s Mot.

for Summ. J. (Dkt. 15).)  The Department cross-moves for summary judgment, contending that

the administrative decision should not be reversed.  (Def.'s Cross-Mot. for Summ. J. (Dkt. 19).)

---

[1]  The IDEIA represents the most recent reauthorization of the Individuals with Disabilities Education Act
("IDEA"), which took effect in July 2005.  See Pub. L. No. 108-446, 118 Stat. 2647 (Dec. 3, 2004).  All statutory
references in this Memorandum and Order will be to the IDEIA, except when quoting from other judicial opinions
that reference the IDEA.

1

For the reasons set forth below, Plaintiffs' motion for summary judgment is DENIED in its entirety and the Department's cross-motion is GRANTED.

## I.    STATUTORY FRAMEWORK

Before addressing the merits of the parties' competing motions for summary judgment, a brief introduction to the IDEIA's statutory landscape and plentiful array of acronyms is beneficial.[2] To receive federal funds under the IDEIA, a state must, among other things, provide all children with disabilities access to a free and appropriate public education ("FAPE"). 20 U.S.C. § 1412(a)(1)(A); Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005). In providing a FAPE, the school district is required to provide "special education and related services tailored to meet the unique needs of a particular child" that are "reasonably calculated to enable the child to receive educational benefits." Walczak v. Fl. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982)). To achieve that end, the IDEIA directs school districts to prepare an Individualized Education Program ("IEP") for each eligible child. See 20 U.S.C. § 1414(d); Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195, 197 (2d Cir. 2002) (describing the IEP as the "centerpiece" of the IDEA system). An IEP is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." R.E. v. New York City Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012) (internal citation and quotation marks omitted).

In New York, the responsibility for developing IEPs has been assigned to local Committees on Special Education ("CSEs"), the members of which are appointed by the local school board or the trustees of school district. N.Y. Educ. Law § 4402(1)(b)(1); Walczak, 142

---

[2] A summary of relevant acronyms is appended to this Memorandum and Opinion as Appendix A.

F.3d at 123. To ensure that a student's "level of achievement and specific needs" is appropriately taken into account when determining his or her educational program, R.E., 694 F.3d at 175, a CSE team will include the student's parents, his or her regular or special education teachers, a school psychologist, a representative of the school district knowledgeable about the general curriculum and availability of resources in the school district, and a parent representative, among others, see N.Y. Educ. Law. § 4402(1)(b)(1)(a); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.3 (2014).

If a student's parents believe that the IEP prepared by the CSE is inappropriate for their child, or otherwise fails to conform to the procedural and substantive requirements of the IDEIA, they may place their child in an appropriate private school and seek retroactive tuition reimbursement from the state. See Sch. Cmte. of Burlington v. Dep't of Educ., 471 U.S. 359, 370 (1985). Under New York's administrative review system, parents challenge an IEP and seek tuition reimbursement by filing a "due process complaint" before an impartial hearing officer ("IHO"). N.Y. Educ. Law § 4404(1). The IHO will conduct an impartial hearing and issue a decision on the merits of the challenge, which may be appealed by either the parents or the school district to a state review officer ("SRO"). Id. § 4404(2); see also 20 U.S.C. § 1415(g) (requiring availability of appeal in certain contexts). Finally, as required by the IDEIA, either party may bring a civil action in state or federal court to review the SRO's decision. 20 U.S.C. § 1415(i)(2)(A); Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195, 197 (2d Cir. 2002). In effect, therefore, the instant suit functions as an appeal from the administrative decisions below.

## II.    BACKGROUND[2]

### A.    G.K.'s General Background

G.K, who currently is eight years old, has been diagnosed as having an Autism Spectrum

Disorder and presents with significant delays in cognitive skills, adaptive skills, and

interpersonal skills. (Pls. 56.1 ¶ 2.) According to an evaluation performed on behalf of the

Department in 2009, G.K. displays similar deficits in his motor, communication, daily living,

and socialization skills. (Id. ¶ 5.) When he was approximately eighteen months old, G.K. began

receiving home-based therapy using an applied behavior analysis ("ABA") approach, as well as

other support services, through the state's Early Intervention Program. (SRO Op. at 2.)[3] At age

three, on the Department's recommendation, G.K. was enrolled at Otsar, a non-public preschool,

but was withdrawn by his parents soon thereafter. (Pls. 56.1 ¶ 4; SRO Op. at 2.)

In September 2009, G.K. was enrolled by his parents at Reach for the Stars Learning

Center ("RFTS"), where he remains a student principally at the Department's expense. (See

Def. 56.1 ¶ 1; Pls. 56.1 Resp. ¶ 1; Compl. (Dkt. 1) at ¶ 41 & Ex. C (Interim Order on Pendency).)

According to the testimony of RFTS staff, the Center provides G.K. with all-day ABA

instruction on a 1:1 student-teacher basis. (Pls. 56.1 ¶¶ 43-44.) During the 2011-2012 school

year, for example, he reportedly was placed in a classroom with four students, four teachers, and

a speech pathologist. (Id. ¶ 41.) As will be discussed in greater detail, G.K.'s parents and his

---

[2]  The factual background provided below is principally derived from Plaintiffs' Local Rule 56.1 Statement of Material Facts ("Pls. 56.1") (Dkt. 16), Defendant's Local Rule 56.1 Statement of Material Facts ("Def. 56.1") (Dkt. 20), Plaintiffs' Response to Defendant's Rule 56.1 Statement ("Pls. 56.1 Resp.") (Dkt. 23), and Defendant's Responses and Objections to Plaintiffs' Local Rule 56.1 Statement of Material Facts ("Def. 56.1Resp.") (Dkt. 21).

[3]  The October 26, 2012, Decision by the State Review Officer in this matter, Application of a Student with a Disability (Case No. 12-074) ("SRO Op."), is attached to the Declaration of Randi M. Rothberg, dated April 19, 2013, as Exhibit A. (Dkt. 17.) The Impartial Hearing Officer's Findings of Fact and Decision ("IHO Op."), dated March 2, 2012, is attached as Exhibit B to the same. To the extent either decision is relied upon for factual background, the parties are directed to the testimony and exhibits cited therein, which were filed under seal in this matter. (See Dkt. 14.)

instructors at RFTS believe that the structured 1:1 learning environment provided at RFTS is important to G.K.'s continued educational, social, and behavioral development. (See Pls. 56.1 ¶ 44; Mem. of Law in Supp. of Pls.' Mot. for Summ. J. ("Pls. Mot.") (Dkt. 18) at 2-3, 30-33.)

## B.     The May 2011 IEP

On May 3, 2011, the Department convened an annual meeting of the CSE to create a new IEP for then-six-year-old G.K in anticipation of the 2011-2012 school year. (Def. 56.1 ¶ 2; Pls. 56.1 ¶ 9.) In attendance were G.K.'s parents, District Representative and Special Education Teacher Melody Fuchs, a Department school psychologist, a Department social worker, a parent member, and three or four representatives from RFTS, including G.K.'s then-current teacher and the Center's Assistant Director. (Def. 56.1 ¶ 2; Pls. 56.1 ¶ 9.) Prior to the CSE meeting, Ms. Fuchs conducted an on-site evaluation of G.K. at RFTS, during which time he was supported 1:1 by a RFTS teacher. (Pls. 56.1 ¶ 7; Tr. at 47, 49.)[4] Concerned by the lack of socialization opportunities available to G.K. in the 1:1 RFTS program, Ms. Fuchs recommended that he be placed in a "comfortable," "therapeutic," and "carefully individualized" classroom where six students are supported by one teacher and one classroom paraprofessional—commonly referred to as a 6:1:1 program. (See Def. 56.1 ¶ 4; Pls. 56.1 ¶ 7; Tr. at 34-35, 40-41, 44-48.) Also before the CSE was an education services report from Dr. Carol Fiorile, a behavioral analyst retained by the Parents, recommending placement in a 1:1 program due to G.K.'s maladaptive behaviors. (Pls. 56.1 ¶ 8.) G.K.'s parents and the RFTS staff present at the CSE meeting likewise expressed a preference that G.K. remain in RFTS's 1:1 program. (Id. ¶¶ 14-16.)

Ultimately, the IEP prepared by the CSE recommended a "12-month school year for G.K. in a special class with a 6:1:1 ratio" in a special school in District 75. (Id. ¶ 3; see also

---

[4] Citations in the form "Tr." refer to the transcript of proceedings before the Impartial Hearing Officer, filed under seal at Docket No. 14. The court will not quote from any material filed under seal unless already quoted by one of the parties or otherwise revealed in a publicly filed document.

Administrative Record ("Record") (Dkt. 14) (filed under seal) at 1048.) All related services, however, were to be provided on an individualized basis, including: 1:1 speech and language therapy ("Speech") for five 45-minute sessions per week; 1:1 occupational therapy ("OT") for five 30-minute sessions per week; and 1:1 physical therapy ("PT") for two 30-minute sessions per week. (Def. 56.1 ¶ 3; Pls. Resp. ¶ 3; Tr. at 34-35.) The IEP further provided that G.K. would receive full-time support on a 1:1 basis from a dedicated health paraprofessional, both in and out of the classroom. (Def. 56.1 ¶ 3.) The IEP set forth seventeen long-term goals for G.K. across a variety of skill categories—as well as sixty-three subsidiary short-term objectives—for G.K.'s 2011-2012 school year. (Id. ¶ 11.) The CSE also considered a special class in a community school for G.K.—though the parties dispute whether that class was a 1:1 program like RFTS—but elected not to place the student in such a program. (Id. ¶ 7; Pls. Resp. ¶ 7; Tr. at 68-70.) The IEP did not provide for parent counseling or training, however. (See SRO Op. at 22-23.)

Recognizing that G.K. "demonstrated behaviors that significantly interfered with learning," the CSE also prepared a Behavior Intervention Plan ("BIP") to accompany the IEP. (Def. 56.1 ¶ 8; Pls. Resp. ¶ 8; Tr. at 52-54.) The BIP detailed G.K.'s maladaptive behaviors, which included "body tensing, hand flopping, crying, vocal protests, screaming and biting his clothing," and set out specific strategies and supports to be employed by his instructors in the recommended 6:1:1 program in their efforts to redress them. (Record at 1067 (BIP); Def. 56.1 ¶ 8.) As required by the IDEIA, the BIP was generated on the basis of a Functional Behavioral Assessment ("FBA") that was also prepared at the CSE meeting, which was in turn based on classroom observations of G.K., verbal reports from CSE attendees, therapists' progress reports, and the report by Dr. Fiorile. (Record at 1068 (FBA); Def. 56.1 ¶ 9.) The FBA and BIP were

6

prepared by the CSE without reference to the BIP developed by G.K.'s instructors at RFTS, which was not provided to the CSE due to ethical concerns. (Id.; Tr. at 328-30.)

### C.  Recommended Placement

In a notice dated June 8, 2011, the Department offered G.K. placement at P4 @ P852 ("P4") for the 2011-2012 school year. (Pls. 56.1 ¶ 30.) Located in Brooklyn, New York, P4 is a public school with a total enrollment of 30 students. (Def. 56.1 ¶ 15; Pls. 56.1 ¶ 30.) Before the IHO, the lead teacher at P4, Ms. Debbie Henry, testified that P4 has two speech and language therapists on staff, as well as an occupational therapist, a physical therapist, and a vision therapist. (Def. 56.1 ¶ 16; Tr. at 134-35, 140-41.) She further testified that for the 2011-2012 school year, P4 had three 6:1:1 classes with students in kindergarten through second grade. (Id. at 134-35.) However, the placement notice received by the Parents did not indicate to which class their son would be assigned. (Id. at 169-70.) Indeed, while Ms. Henry testified that a 6:1:1 class run by Ms. Meredith Williams would have been the likeliest class placement for G.K., the student was never formally assigned to Ms. Williams' class and there is no indication that the Parents were aware of that slot at the time of their placement decision. (Def. 56.1 ¶¶ 22-26; Pls. 56.1 ¶¶ 33-34; Tr. at 141-42, 169-70.)

On June 23, 2011, the student's father, Y.K., and a teacher from RFTS, Ms. Barnett, visited P4 to determine whether the proposed placement would be appropriate for G.K. (Pls. 56.1 ¶ 31.) Later the same day, Y.K sent a letter to the Department formally rejecting the proposed placement. (Id. ¶ 32; Tr. at 527-30.) The rejection letter outlined several reasons why the Parents believed P4 to be inappropriate for their child, including: "(a) P4 did not offer sufficient 1:1 instruction from ABA-trained professionals; (b) G.K. would not be grouped based on his individual needs; (c) P4 lacked a sensory gym and could not meet G.K.'s OT needs; and (d) G.K. would be required to eat lunch with approximately 35 students, which would be

overwhelming for him." (Pls. 56.1 ¶ 32; see also Def. 56.1 ¶ 27.) The letter further indicated that unless the Department proposed an appropriate placement, the Parents planned to enroll G.K. at RFTS for the 2011-2012 school year and provide him with additional home-based ABA services, and that they would look to the Department for reimbursement and direct funding under the IDEIA. (Def. 56.1 ¶ 27; Tr. at 527-30.)

### D. Due Process Complaint

On October 18, 2011, the Parents filed a due process complaint alleging that the May 2011 IEP denied G.K. a FAPE and requested as relief, among other things, reimbursement for tuition paid to RFTS for the 2011-2012 school year and direct funding for 10 hours per week of private after-school ABA instruction. (Def. 56.1 ¶ 28; Pls. 56.1 ¶ 60; SRO Op. at 3.) In support of their contention that the Department had denied G.K. a FAPE, the Parents' due process complaint set out over thirty-five alleged deficiencies in the IEP, fourteen of which were discussed by the SRO. (See SRO Op. at 3; see also Record at 820-23.) The student's parents likewise challenged the proposed placement, asserting that P4: did not offer sufficient 1:1 instruction; did not offer sufficient staff training and supervision; did not have a sensory gym and did not prepare sensory diets for students; that it lacked individualized and sufficient behavioral supports; that G.K. would have been grouped based solely upon his age rather than his capabilities; and that G.K. could not learn or eat lunch in a group setting, among other objections. (See SRO Op. at 3.)

Citing the IDEIA's pendency or "stay put" provision, the Parents also argued that G.K. should remain enrolled at RFTS at the Department's expense during the pendency of their challenge to the 2011 IEP. (Id.) That request was granted on November 9, 2011, by the IHO's

Interim Order on Pendency. (See Compl., Ex. C.) To the best of the court's knowledge, G.K. has remained a student at RFTS during the intervening two and a half years.[5]

### E.   Due Process Hearing and IHO Decision

An impartial hearing was held before an IHO over five non-consecutive days between November 9, 2011, and February 7, 2012. (Def. 56.1 ¶ 29; Pls. 56.1 ¶ 61; SRO Op. at 4.) Melody Fuchs, a special education teacher and district representative who attended the CSE meeting (IHO Op. at 4-7; Tr. at 32-122), and Debbie Henry, the lead teacher at P4 (IHO Op. at 7-9l; Tr. at 133-222), testified on behalf of the Department. For the Plaintiffs, the IHO heard testimony from Y.K., the student's father (IHO Op. at 9-11; Tr. at 517-57), Helene Wasserman, the Educational Director at RFTS (IHO Op. at 11-19; Tr. at 235-393), Carol Fiorile, a board certified behavior analyst who examined G.K. in 2009 and again in 2011 (IHO Op. at 19-22; Tr. at 393-428), Hope Rice, a speech and language pathologist at RFTS (IHO Op. at 22-23; Tr. at 428-50), Efrat Nakash, an occupational therapist at RFTS (IHO Op. at 23-25; Tr. at 462-94), and Nicole Barnett, the lead teacher at RFTS (IHO Op.at 25-27; Tr. at 494-517). The court has reviewed transcript of proceedings before the IHO and will, where pertinent, discuss the content of each witness's testimony in subsequent sections.

By order dated March 2, 2012, the IHO determined that the Department had offered G.K. a FAPE for the 2011-2012 school year, and denied the Plaintiffs' requested relief. (IHO Op. at 30-32.) After summarizing the testimony of each witness presented at the hearing (id. at 3-27), the IHO concluded that the 6:1:1 program recommended by the May 2011 IEP was appropriate for a first-grade student who demonstrates the capacity to begin academic instruction and can make his needs known, and that G.K.'s specific behavioral issues were "not a basis for

---

[5]   On September 6, 2011, the same IHO found that G.K.'s 2010-2011 IEP denied him a FAPE and ordered the Department to reimburse the Parents for the cost of the student's tuition at RFTS for the 2010-2011 school year. (SRO Op. at 3; Pls. 56.1 ¶ 65.)

continuing a program that is isolating and controlled." (Id. at 31.) The IHO's opinion also found, albeit unnecessarily, that the "extraordinarily restrictive setting" and "lack of an academic base" at RFTS was no longer appropriate for G.K. during the 2011-2012 school year, noting that he is "at an age where any program he receives must include the teaching of academics and socialization." (Id. at 31, 34-35.) The IHO's decision did not address equitable considerations.

## F.    The SRO Appeal

On April 3, 2012, Plaintiffs appealed from the IHO's decision to an SRO in the New York State Education Department's Office of State Review. (Pls. 56.1 ¶ 66; SRO Op. at 5.) Maintaining that the IHO's determination that the CSE had offered G.K. a FAPE for the 2011-2012 school year was incorrect, Plaintiffs encouraged the SRO to reverse the IHO's March 3, 2012, decision and award them appropriate relief. (Id.) The Parents argued that May 2011 IEP was inappropriate for G.K. because, inter alia, their son required 1:1 ABA instruction and that by predetermining G.K.'s placement in a 6:1:1 program, the CSE had denied them an opportunity to meaningfully participate in the generation of G.K.'s IEP. (Id.) In addition, Plaintiffs maintained that the district representative lacked sufficient familiarity with G.K. to appreciate his individual educational needs, including his need for assistive technology. (Id.) The Parents also claimed that the IEP failed to provide a FAPE because it did not provide for extra-curricular instruction, did not include a provision for parent counseling and training, and contained goals and objectives that were inappropriate for G.K. and lacked requisite measurement criteria. (Id.) Finally, Plaintiffs contested the sufficiency of the FBA and BIP developed for their son, as well as the substantive adequacy of P4 as a proposed placement. (Id.) The Department countered that it had indeed afforded the student a FAPE and appropriate placement, asserting that the IHO's decision rejecting each of the above objections to the IEP and proposed placement should be affirmed in its entirety. (Id. at 5-6.)

In a decision dated October 26, 2012, the SRO upheld the IHO decision in all respects, agreeing that the Department had offered G.K. a FAPE for the 2011-2012 school year and rejecting Plaintiffs' requests for reimbursement and direct funding. (SRO Op. at 28.) The SRO found the Plaintiffs' claim that the CSE had predetermined G.K.'s placement in in a 6:1:1 program, as well as their objections to the BIP prepared for G.K. and to the appropriateness of the academic goals contained in the IEP, were unsupported by the hearing record. (Id. at 9-12, 17-21.) The SRO further held that any procedural deficiencies that were present in the IEP— including the absence of parental training and counseling—did not amount to the denial of a FAPE, either individually or collectively. (Id. at 16-17, 22-23.) With regard to Plaintiffs' argument that a 6:1:1 environment was inappropriate for G.K., the SRO concluded that:

> [T]he hearing record supports the IHO's conclusion that the May 2011 IEP provided appropriate supports and services to the student including placement in a 6:1+1 special class which offered the opportunity for individualized programming, some 1:1 instruction, full-time paraprofessional services, daily related services on an individual basis, and . . . a BIP, such that placement in a full-time 1:1 education setting was not warranted in order for the student to receive a FAPE.

(Id. at 14-17.) The IHO's findings regarding the proposed placement similarly were upheld. Noting that Plaintiffs' arguments that the IEP could not have been implemented at P4 were unduly speculative, the SRO nevertheless concluded that "the evidence in the hearing record does not support the conclusion that the district would have deviated from the student's IEP in a material or substantive way." (Id. at 23-24.) Finally, the SRO held that Plaintiffs' contention that the district representative present at the 2011 CSE meeting lacked sufficient familiarity with G.K. and his individual needs to make appropriate programmatic recommendations for him was outside the scope of the appeal because Plaintiffs had neither included that allegation in the due process complaint nor obtained the Department's consent to expand the scope of the IHO

11

hearing. (Id. at 7-8.) Having affirmed the IHO's decision that the Department had offered a FAPE, the SRO declined to consider any remaining arguments concerning the appropriateness of the unilateral placement or whether the equities favored tuition reimbursement. (Id. at 28.)

## G.    District Court Action

On January 23, 2013, Plaintiffs timely filed the current action seeking independent review of the SRO's decision under 20 U.S.C. § 1415(i)(2)(A). (See Compl.) Pursuant to the court's April 9, 2013, scheduling order (Dkt. 11), the parties filed their cross-motions for summary judgment on June 28, 2013.

## III.    DISCUSSION

In the current context, a motion for summary judgment functions as an appeal from the SRO's administrative decision below. See M.H. v. New York City Dep't of Educ., 685 F.3d 217, 226 (2d Cir. 2012) ("Though the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination, not a summary judgment [motion]." (citation omitted)); E.F. v. New York City Dep't of Educ., No. 12-CV-2217 MKB, 2013 WL 4495676, at *10 (E.D.N.Y. Aug. 19, 2013) ("Summary judgment in this context is effectively an appeal of the State's decision."). In considering the instant summary judgment motions, the court is called upon to conduct an independent review of the administrative record, along with any additional evidence submitted by the parties—of which there is none—and to determine by a preponderance of the evidence whether the IDEIA's strictures have been satisfied. See 20 U.S.C. § 1415(i)(2)(C); M.H., 685 F.3d at 240; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007) (stating that federal courts "must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence'" (citation omitted)). The parties' motions therefore "serve[] as a 'pragmatic procedural mechanism' for reviewing a state's

compliance with the procedures set forth in [IDEIA] and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits." Lillbask v. Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005) (citations omitted).

For the reasons set forth below, the court concludes that the SRO's decision should be upheld and that the May 2011 IEP and proposed placement constituted a FAPE for the 2011-2012 school year.

## A. Standard of Review

The standard by which a district court reviews the final determination of the SRO has been characterized as "modified de novo review." See P.K. ex rel. S.K. v. New York City Dep't of Educ. (Region 4), 819 F. Supp. 2d 90, 103 (E.D.N.Y. 2011), aff'd 526 F. App'x 135 (2d Cir. 2013). While a district court must "engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence," the district court's role in reviewing state decisions under the IDEIA is "circumscribed." Gagliardo, 489 F.3d at 112-13 (citation omitted); see also P.K. ex rel. S.K. v. New York City Dep't of Educ. (Region 4), 526 F. App'x 135 (2d Cir. 2013) ("[R]eview of state administrative decisions 'requires a more critical appraisal of the agency determination than clear-error review[,] but nevertheless falls well short of complete de novo review.'" (quoting M.H., 685 F.3d at 244)). Indeed, the Supreme Court and Second Circuit admonish that the appellate posture of these cases is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Id. (quoting Rowley, 458 U.S. at 206).

"To the contrary, federal courts reviewing administrative decisions must give 'due weight' to these proceedings, mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" Gagliardo, 489 F.3d at 113 (quoting Rowley, 458 U.S. at 206, 208) (brackets omitted);

see also Walczak, 142 F.3d at 129 ("While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings . . . ."). Courts may not make "subjective credibility assessment[s]," nor may they "ch[oose] between the views of conflicting experts on . . . controversial issue[s] of educational policy . . . in direct contradiction of the opinions of state administrative officers who had heard the same evidence." M.H., 685 F.3d at 240 (quoting Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 383 (2d Cir. 2003)). Rather, the district court must show "substantial deference to state administrative bodies on matters of educational policy," Cerra, 427 F.3d at 191, particularly where the SRO's review has been "thorough and careful," Walczak, 142 F.3d at 129. Factual findings by the administrative decision-makers likewise warrant deference provided they are "reasoned and supported by the record." Gagliardo, 489 F.3d at 114. However, this "due weight" is not implicated with respect to issues of law, such as "the proper interpretation of the federal statute and its requirements." Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1122 (2d Cir. 1997). Ultimately, "the persuasiveness of a particular administrative finding, or lack thereof, is likely to tell the tale." M.H., 685 F.3d at 244.

In considering claims for tuition reimbursement under the IDEIA, courts are directed to apply the three-step Burlington/Carter inquiry. Cerra, 427 F.3d at 192. First, the district court must examine whether the school district's proposed plan will provide the student with a FAPE. See C.F. ex rel. R.F. v. New York City Dep't of Educ., No. 11-5003-CV, 2014 WL 814884, at *2 (2d Cir. Mar. 4, 2014). Embedded in the court's evaluation of this threshold requirement are inquiries into "whether the state has complied with the procedures set forth in the IDEA" and "whether the proposed IEP is substantively appropriate in that it is 'reasonably calculated to enable the child to receive educational benefits.'" A.C. ex rel. M.C. v. Bd. of Educ. of The

Chappaqua Cent. Sch. Dist., 553 F.3d 165, 171-72 (2d Cir. 2009) (quoting Cerra, 427 F.3d at 192.). Only if the IEP is procedurally or substantively deficient will the court reach the final two steps of the Burlington/Carter test and consider "whether the parents' private placement is appropriate the child's needs" and whether the equities favor reimbursement. C.F., 2014 WL 814884, at *2; see also A.C., 553 F.3d at 171; T.Y. v. City of New York Dep't of Educ., 584 F.3d 412, 417 (2d Cir. 2009).

As the party initiating review of the SRO's administrative decision, Plaintiffs bear the burden of persuasion as to the inappropriateness of the May 2011 IEP and the appropriateness of G.K.'s placement at RFTS during the 2011-2012 school year. See T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009) (citing Gagliardo, 489 F.3d at 112).

## B.    The CSE Complied with the IDEIA's Procedural Requirements

The procedural inquiry under the IDEIA "is no mere formality, as adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." Id. at 252-53 (quoting Walczak, 142 F.3d at 129). However, unlike substantive deficiency, procedural violations only entitle a parent to tuition reimbursement if they "'impeded the child's right to a FAPE', 'significantly impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'" R.E., 694 F.3d at 190 (quoting 20 U.S.C. § 1415(f)(3)(E)(2)). Accordingly, it is not the case that "every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." A.C., 553 F.3d at 172; E.F., 2013 WL 4495676, at *11.

Plaintiffs allege five procedural deficiencies in the development of G.K.'s May 2011 IEP, which individually and cumulatively render the IEP defective under the IDEIA. (Pls. Mot. at 10-

20.) Specifically, they claim that: (1) the CSE predetermined G.K.'s placement in a 6:1:1

program and therefore denied the Parents meaningful participation in the development of their

child's IEP; (2) the CSE failed to develop appropriate and objectively measurable goals and

objectives for G.K.; (3) the CSE failed to consider assistive technology for G.K.; (4) the CSE

failed to prepare an appropriate FBA or BIP for G.K.; and (5) the CSE failed to offer the Parents

individualized parent counseling and training.[6] (See id.) On appeal, the SRO upheld the IHO's

determination that, based on the record generated at the impartial hearing, what few procedural

defects that do exist did not result in the denial of a FAPE. (SRO Op. at 9-12, 16-23.)

      1.    Predetermination

Plaintiffs first allege that the CSE predetermined G.K.'s placement in a 6:1:1 program

and "failed to consider the full continuum of programming that may have been appropriate for

G.K." (Pls. Mot. at 10-13.) Specifically, they aver that the CSE failed to consider the Parents'

and RFTS staff's recommendations that G.K. be placed in a 1:1 program with additional at-home

ABA instruction. (Id.) This failure allegedly denied G.K.'s parents meaningful participation in

the development of their child's IEP, as required by the IDEIA. (Id.) The SRO found

---

[6] The SRO concluded that Plaintiffs' contention that Ms. Fuchs, the district representative and special education teacher on the CSE team, lacked sufficient familiarity with G.K. to make appropriate programmatic recommendations was raised for the first time on appeal and therefore outside the scope of his review. (SRO Op. at 8.) That determination has been overcome by recent clarifications in the law. In C.F., which was decided earlier this month, the Second Circuit clarified that the so-called "waiver rule" applied by the SRO, which requires parents to allege all deficiencies in their initial due process complaint, is not to be applied mechanically and only limits what may be raised at the due process hearing. C.F., 2014 WL 714884, at *6-7. Here, the court believes that Plaintiffs' allegation in their due process complaint that the Department "failed to adequately assess and evaluate [G.K.]" sufficiently put the Department on notice of Plaintiffs' more refined point concerning Ms. Fuchs' personal knowledge of the student. (See Record at 821 (Due Process Complaint).) But this finding has no effect on the outcome of the instant motions. Plaintiffs do not challenge the SRO's determination that the May 2011 IEP was based on sufficient evaluative data or that Ms. Fuchs alleged unfamiliarity with G.K. did not result in the denial of a FAPE. (SRO Op. at 8-9 & n.2, 12-14.) In addition to the recommendations of Ms. Fuchs, which were based on an on site evaluation of G.K. in January 2011, the CSE considered verbal and written input from RFTS staff members and other experts who had evaluated the student. (Id.) Simply put, the court finds Plaintiffs' argument that Ms. Fuchs' lacked sufficient familiarity with G.K. to make appropriate programmatic recommendations to be unsupported by the evidence, and additionally concurs in the SRO's well-reasoned and persuasive determination that the CSE had adequate evaluative data before it to craft a procedurally and substantively appropriate IEP.

insufficient evidence to support Plaintiffs' predetermination argument, noting instead that the "hearing record reflects meaningful and active parental participation in the development of the student's May 2011 IEP, and willingness among the CSE members to consider different program options for the student." (SRO Op. at 10.) The court sees no basis in the hearing record to disturb this conclusion.[7]

Predetermination of a child's IEP amounts to a procedural violation of the IDEIA if it deprives the student's parents of meaningful participation in the IEP process. See D.D-S. v. Southold Union Free Sch. Dist., No. 09-CV-5026 (JS)(WDW), 2011 WL 3919040, at *10 (E.D.N.Y. Sept. 2, 2011); J.G. v. Kiryas Joel Union Free Sch. Dist., 777 F. Supp. 2d 606, 648-49 (S.D.N.Y. 2011) ("The 'core of the statute' is that the development of the IEP be a [cooperative process] between the parents and the district, and predetermination . . . undermines the IDEA's fundamental goal to give parents a voice in the educational upbringing of their children." (citation omitted)); see also Nack ex rel. Nack v. Orange City Sch. Dist., 454 F.3d 604, 610 (6th Cir. 2006). However, a district's consideration of potential educational programs in anticipation of a CSE meeting does not itself amount to predetermination provided the district maintains the requisite "open mind" during the meeting. See T.P., 554 F.3d at 253-54; M.W. ex rel. S.W. v. New York City Dep't of Educ., 869 F. Supp. 2d 320, 333-34 (E.D.N.Y. 2012); A.G. v. Frieden, No. 08-CV-1576 (LAK), 2009 WL 806832, at *7 (S.D.N.Y. Mar. 26, 2009); see also M.M. ex rel. A.M. v. New York City Dep't of Educ. Region 9 (Dist. 2), 583 F. Supp. 2d 498, 506 (S.D.N.Y. 2008) (noting "draft IEPs are not impermissible under the IDEA"). Courts also regularly reject claims of predetermination where the record reflects active and meaningful

---

[7] Plaintiffs have submitted no additional evidence to support their claims, notwithstanding their legal entitlement to do so. See U.S.C. § 1415(i)(2)(C)(ii). As such, the court's independent review is limited to the same record that was before the IHO and SRO below.

participation by the student's parents in the formulation of the IEP. See M.W., 769 F. Supp. 2d at 334; Kiryas Joel, 777 F. Supp. 2d at 648 (collecting cases).

In contending that the CSE failed to consider the "full continuum of programming," namely 1:1 instruction, Plaintiffs place great reliance on Ms. Fuchs' testimony before the IHO that a 6:1:1 program is the most restrictive program available in the Department's public schools. (Pls. Mot. at 11; see also Tr. at 106-07.) But this fact alone is insufficient to establish predetermination. In M.H. v. New York City Dep't of Educ., the Second Circuit rejected a nearly identical argument concerning the Department's reliance on 6:1:1 programming, noting that "[i]n light of the district's broad discretion to adopt programs that, in its educational judgment, are most pedagogically effective, we cannot simply assume that the decision to rely heavily on a single method or style of instruction is necessarily inappropriate." 685 F.3d at 257-58. Moreover, it does not follow from Ms. Fuchs' testimony that the CSE did not or would not have considered a private 1:1 program (i.e., RFTS) had it deemed a more restrictive setting appropriate for the student. To the contrary, the May 2011 IEP expressly states that the CSE did consider specialized programming for G.K. in a community school, but rejected that option as insufficient to address the student's academic, cognitive, and behavioral needs. (Def. Memo. of Law in Supp. of Def.'s Cross-Mot. for Summ J. ("Def. Mot.") (Dkt. 22) at 3; Record at 1065.) Even if this was not the case, once the CSE determined that a 6:1:1 placement was appropriate for G.K., it was under no obligation to consider more restrictive programs. See E.F., 2013 WL 4495676, at *15; A.D. v. New York City Dep't of Educ., No. 12-CV-2673 (RA), 2013 WL 1155570, at *7-8 (S.D.N.Y. Mar. 19, 2013); see also 20 U.S.C. § 1412(a)(5) (requiring CSEs to recommend a placement that would be the "least restrictive environment" for a student).

Accordingly, like the SRO below, the court finds Plaintiffs' argument that the CSE failed to consider the "continuum" of programming to be unsupported by the record.

The record likewise reflects "meaningful and active" parental participation in the formulation of the May 2011 IEP. Relying on the IEP and testimony adduced at the IHO hearing, the SRO reasonably found that "both parents participated in the CSE meetings" along with various RFTS officials, that both G.K's father and the RFTS teachers requested that the CSE "continue the student's program at RFTS for the upcoming school year," and that the Department "sought the parents' input to formulate program recommendations for the student" at and in anticipation of the CSE meeting. (SRO Op. at 10; see also Def. Mot. at 16-17.) The court concurs in the SRO's assessment. G.K.'s parents were afforded a meaningful opportunity to participate in the CSE's development of the 2011-2012 IEP, of which they took full advantage. The mere fact that the CSE's ultimate recommendation deviated from their express request that G.K. be permitted to remain at RFTS does not render the Parents "passive observers" or evidence any predetermination on the part of the CSE. See, e.g., P.K. ex rel. P.K. v. Bedford Cent. Sch. Dist., 569 F. Supp. 2d 371, 383 (S.D.N.Y. 2008) ("The fact that the District staff ultimately disagreed with the opinions of plaintiffs and their outside professionals does not mean that plaintiffs were denied the opportunity to participate in the development of the IEP's, or that the outcomes of the CSE meetings were 'pre-determined.' A professional disagreement is not an IDEA violation."); see also Walczak, 142 F.3d at 132 ("What the [IDEIA] guarantees is an 'appropriate' education, 'not one that provides everything that might be thought desirable by loving parents.'").

Accordingly, the court declines to reverse the SRO's persuasive conclusion that the hearing record does not support Plaintiffs' predetermination claim.

2.     Goals and Objectives

Plaintiffs also challenge the May 2011 IEP on the grounds that the CSE failed to develop

appropriate and objectively measurable goals and objectives for G.K. (Pls. Mot. at 13-17.) An

IEP must contain a statement of "measurable annual goals, including academic and functional

goals" designed to meet that child's individual needs. 20 U.S.C. § 1414(d)(1)(A)(i)(II). New

York regulations further require that such goals include "evaluative criteria, evaluation

procedures and schedules to be used to measure progress toward meeting the annual goal." N.Y.

Comp. Codes R. & Regs. Tit. 8, § 200.4(d)(2)(iii)(b); see also 20 U.S.C. § 1414(d)(1)(A)(i)(III).

Affirming the IHO's decision below, the SRO concluded that the goals and short-term objectives

generated by the CSE for G.K.'s IEP were appropriate and that, to the extent any goals or

objectives lacked adequate evaluative criteria or procedures, it did not result in a denial of a

FAPE. (SRO Op. at 11-12.)[8]

Generally, "courts are 'reluctant to find a denial of a FAPE based on failures in IEPs to

identify goals or methods of measuring progress.'" E.F., 2013 WL 4495676, at *19 (quoting J.L.

v. City Sch. Dist. of N.Y.C., No. 12-CV-1516 (CM), 2013 WL 625064 (S.D.N.Y. Feb. 20,

2013)) (brackets omitted); R.B. v. New York City Dep't of Educ., No. 12-CV-3763 (AJN), 2013

WL 5438605, at *14 (S.D.N.Y. Sept. 27, 2013); P.K. ex rel. S.K., 819 F. Supp. 2d at 109. As the

Second Circuit has stated, "[t]he sufficiency of goals and strategies in an IEP is precisely the

type of issue upon which the IDEA requires deference to the expertise of the administrative

officers." Grim, 346 F.3d at 382; A.M. ex rel. Y.N. v. New York City Dep't of Educ., No. 12-

CV-5573 (JMF), 2013 WL 4056216, at *11-14 (S.D.N.Y. Aug. 9, 2013). Here, deference is

_____

[8] The SRO's opinion appears to suggest that Plaintiffs' objections to the goals and objectives included in the May
2011 IEP may not have been properly raised. (See SRO Op. at 11.) Because these claims likely were properly raised
within the scope of Plaintiffs' appeal to the SRO, see C.F., 2014 WL 714884, at *6-7, the court treats them as
properly raised for the purposes of its consideration of the instant motions.

particularly apt where the IHO and SRO decisions are in agreement and are based on the same record as that before the district court. (SRO Op. at 11-12; IHO Op. at 30-32.) See A.M., 2013 WL 4056216, at *11-12.

Plaintiffs' primary contention is that the academic goals included in the May 2011 IEP were based on G.K.'s chronological age, rather than his individual needs, and are therefore inappropriate. (Pls. Mot. at 14-15; Pls. Memo. of Law in Opp'n to Def.'s Cross-Mot. ("Pls. Reply") (Dkt. 24) at 5-6.) In developing the seventeen goals for the IEP, the CSE included Speech and OT goals provided by RFTS but omitted the school's suggested pre-academic goals. (Pls. Mot. at 14; Tr. at 64-67.) Instead, the CSE added academic goals that, in the Department's estimation, were "more appropriate" for G.K. (Tr. at 67.) The mere fact that Plaintiffs' disagree with the CSE's pedagogical judgment does not necessarily render the goals inappropriate. In rejecting Plaintiffs' challenge to the IEP's goals and objections, the SRO clearly appreciated the contours of the professional disagreement at issue. (See SRO Op. at 11-12.) On one hand, Ms. Barnett of RFTS testified that G.K. was "not yet at academic level" because he was "still evolving language-wise." (Id. at 505-506.) Ms. Fuchs, by contrast, left her evaluation of G.K. feeling "disturbed" by the low level of academic instruction G.K. received at RFTS. (IHO Op. at 4; Tr. at 88-90.) Indeed, even Ms. Wasserman acknowledged that G.K. was in the "very beginning stages" of developing math and reading skills. (Id. at 323-27; see also id. at 325-26 (noting that G.K. had already met some of the academic short-term objectives in the IEP).) Faced with competing opinions on G.K.'s readiness and capacity for academic instruction, both administrative officers—like the CSE before them—drew on their considerable expertise in parsing the relevant testimony and evidence in order to resolve this dispute. As such, their complimentary decisions are entitled to considerable deference, see Grim, 346 F.3d at 382, and

21

the court sees inadequate reason in the hearing record to depart from the IHO's and SRO's finding that IEP's academic goals are appropriate for G.K. [9]

Plaintiffs similarly contest the IEP's goals on the grounds that they lack sufficient evaluative criteria, procedures, and schedules. (Pls. Mot. at 15.) Specifically, they argue that "[t]he DOE's Goals fail to identify a method of tracking G.K.'s progress, how often progress would be measured, and who would be responsible for implementing the Goals." (Id.) The SRO acknowledged that the IEP included some "academic goals that lacked evaluative criteria or schedules," but concluded that this omission did not result in the denial of a FAPE. (SRO Op. at 12.) In the court's view, both Plaintiffs and the SRO overstate the magnitude of this deficiency. First, with regard to evaluative schedules, each page of the IEP on which the goals and objectives are listed provides that "[t]here will be 4 progress reports per year." (Record at 1054-61, 1063-64.) This is sufficient under the IDEIA. See R.B., 2013 WL 5438605, at *14. Second, all but G.K.'s two PT goals are accompanied by a numerical code indicating the method by which the student's progress will be measured (i.e., teacher made materials, class activities, teacher/provider observations). (Def. Mot. at 4 & n.2; Record at 1054-61, 1063-64.) Further, the IEP provides that G.K.'s progress toward the two PT goals, which are hand-written and contain granular evaluative criteria, will be measured "as seen" through the student's "improved ball play and balance skills" and his "improved jumping skills." (Id. at 1061.) The court finds that, between the 15 coded goals and 2 "as seen" goals, the IDEIA's requirement that an IEP contain "evaluative procedures" is met.

---

[9] The court also notes that to the extent Plaintiffs premise their substantive objections to the goals and objectives on G.K.'s scores on his Assessment of Basic Language and Learning Skills ("ABLLS") test, which is dated June 1, 2011, they will not be entertained. (Pls. Mot. at 14-15.) The student's ABLLS test was completed after the May 2011 CSE meeting, and was entered into evidence by the IHO for the sole and exclusive purpose of proving Step II of the Burlington/Carter test (i.e., the appropriateness of the unilateral placement). (See IHO Op. at 30; Tr. at 270-71, 345.) Plaintiffs may not rely on G.K.'s ABLLS results to challenge an IEP that was drafted several months earlier, as the relevant information was not available to the CSE. See R.E., 694 F.3d at 186 (holding that an "IEP must be evaluated prospectively as of the time of its drafting").

With regard to evaluative criteria, the SRO acknowledged that some of the IEP's goals appeared to be deficient but that any such deficiency did not amount to the denial of a FAPE. (SRO Op. at 12.) While the SRO's reasoned determination that any deficiencies in the goals' evaluative criteria did not violate the IDEIA is entitled to due weight, the court also believes the SRO likely overestimated the severity of the technical deficiency. As a preliminary matter, of the seventeen long-term goals set forth in the IEP, sixteen were accompanied by subsidiary short-term objectives that may be relied upon to remedy any top-level deficiency. (Def. Mot. at 4 n.2.) See, e.g., E.F., 2013 WL 4495676, at *18-19 (recognizing that short-term objectives may remedy deficiencies in vague or overly broad goals); D.A.B., 2013 WL 5178267, at *11 (same). Ten of the seventeen goals (or their subsidiary objectives) included express and quantifiable evaluative criteria, such as performing a task with "80% accuracy" or in "3 consecutive sessions." (Record at 1054-57, 1061.) Of the remaining seven sets of goals and objectives, five goals (or their subsidiary objectives) set forth specific tasks for G.K. to complete during the evaluative period, such as "comparing 3 pairs of equal sets of 0 to 10 objects" or "match[ing] lower case letters." (Id. at 1058-60.) While these may lack the same precise achievement standards contained in the other ten, in the court's estimation the component tasks are sufficiently specific so as to allow them to be utilized to demonstrate G.K.'s progress over the four reporting periods. See A.M., 2013 WL 4056216, at *12-13 ("Where an IEP's goals are deficient because they did not indicate a target achievement level against which progress could be measured, an SRO and district court may still find them to be 'measurable' if the IEP include[d] a description of how the student's progress toward meeting the annual goals will be measured during the year the IEP is in effect" (internal citation and quotation marks omitted)); see also R.R. ex rel. M.R. v. Scarsdale Union Free Sch. Dist., 615 F.Supp.2d 283, 295

(S.D.N.Y.2009) (affirming SRO's conclusion that goals were "measurable" notwithstanding the absence of a target achievement level), aff'd sub nom. R.R. v. Scarsdale Union Free Sch. Dist., 366 F. App'x 239 (2d Cir. 2010). Thus, for five of the remaining seven sets of goals and objectives—which include all the challenged academic goals—the failure to include a specific achievement standard does not render them non-measurable under the IDEIA.[10] Affording the administrative decisions below appropriate deference, the court concurs in the SRO's ultimate determination that the absence of quantifiable evaluative criteria for a select few of IEP's goals, while amounting to a technical deficiency, is insufficient to deprive G.K. of an educational opportunity or otherwise invalidate the entire IEP when fairly considered in its entirety. See id.; S.H. v. New York City Dep't of Educ., No. 10-CV-1041 (PKC), 2011 WL 666098, at *4-5 (S.D.N.Y. Feb. 15, 2011).

Finally, Plaintiffs argue that some of the IEP's goals and objectives were developed after the CSE meeting and without the involvement of G.K.'s parents. (Id. at 16.) Relying on testimony from both parties' witnesses, the SRO reasonably found that "hearing record demonstrates that all of the goals and short-term objectives were reviewed with the committee members, including the parents, during the May 2011 meeting." (SRO Op. at 11.) Ms. Fuchs testified that that the goals included in G.K.'s IEP were discussed at the CSE meeting, which appears to be corroborated by Ms. Wasserman's account of the meeting. (Tr. at 67, 111, 323-27.) Accordingly, as the SRO concluded, Plaintiffs have not credibly shown that any of the goals or objectives included in the IEP were not discussed during the CSE meeting. See S.F. v.

---

[10] The two goals that lack evaluative criteria concern (i) G.K.'s participation in physical education activities and (ii) his ability to utilize the assistance provided by the assigned paraprofessional when participating in school activities. In the court's view, these goals do not naturally lend themselves to precise evaluation or measurement. While compliance with the IDEIA's procedural requirements "is no mere formality," T.P., 554 F.3d at 252, to invalidate an otherwise appropriate IEP on the basis of this minor deficiency would elevate form over substance to an inappropriate degree.

New York City Dep't of Educ., No. 11-CV-870 (DLC), 2011 WL 5419848, at *11 (S.D.N.Y. Nov. 9, 2011) (rejecting plaintiffs contention that goals were drafted after CSE meeting where record showed extensive discussion of same).

Thus, while recognizing that the IEP's recitation of goals and objectives is not perfect, the court defers to the reasoned judgment of the SRO and concludes that Plaintiffs have failed to establish that the plan's goals were inappropriate or so procedurally deficient so as to deny G.K. a FAPE or his parents the meaningful participation guaranteed by the IDEIA.

      3.    Assistive Technology

Plaintiffs also claim that the CSE's "failed to evaluate G.K. for assistive technology and failed to recommend[] assistive technology services or support," rendering the May 2011 IEP inappropriate. (Pls. Mot. at 16.) After reviewing G.K.'s current speech and communication skills and the related goals set forth in the IEP, the SRO concluded:

> Review of the evidence in the hearing record does not overall indicate that RFTS believed an assistive technology evaluation of the student was necessary in order for personnel to provide him with appropriate speech-language and educational services, nor does it suggest that the student's level of communication skills was such that a formal assistive technology evaluation was required for the student to receive a FAPE.

(SRO Op. at 17.) The SRO further noted that G.K.'s current speech-language therapist at RFTS, who participated in the CSE meeting, did not recommend that an augmentative communication evaluation be performed. (Id.; see also Def. Mot. at 19-21.) Plaintiffs object to this determination, insisting that it is the Department's obligation to recommend assistive technology, if necessary, and that the SRO wrongly relied on retrospective testimony offered by Ms. Fuchs explaining why an evaluation was not performed. (Pls. Mot. at 16.)

In developing an IEP, the IDEIA requires that a CSE "consider whether the child needs assistive technology devices and services." 20 U.S.C. § 1414(d)(3)(B)(v). As the SRO correctly

noted, the CSE relied on the Parents and RFTS staff—including and especially his then-current speech therapist—for information on and evaluations of the student's current skills and needs. See E.F., 2013 WL 4495676, at *20. Yet, according to Ms. Fuchs uncontroverted testimony, nobody at the CSE meeting recommended that G.K. should be evaluated for assistive technology. (Tr. 49-51) The record suggests that had such a request been made, the Department would have taken appropriate steps. (Id.) As such, the court concurs in the SRO's reasonable conclusion that the evidence does not support Plaintiffs' position that "a formal assistive technology evaluation was required for the student to receive a FAPE." (SRO Op. at 17.)

Even in the absence of a formal evaluation, the record reflects that the CSE did, in fact, account for G.K.'s reliance on certain types of assistive technologies when crafting his 2011-2012 IEP. Plaintiffs fault the CSE for not accounting for his use of "communication boards" to augment his communication skills. (Pls. Mot. at 16; Pls. Reply at 7.) However, as the SRO correctly noted, the IEP acknowledges G.K.'s use of such aides and provides for their continued use in the 6:1:1 program by incorporating them into the short-term objectives associated with his expressive language goal. (SRO Op. at 17; Record at 1050, 1055.) The court finds no evidence in the record to suggest that the Department would have deviated from the IEP in this regard.

Accordingly, Plaintiffs' contention that the IEP lacks provisions for assistive technology is not supported by the hearing record and is otherwise insufficient to establish the denial of a FAPE. The court likewise rejects Plaintiffs' argument that Ms. Fuchs' testimony was impermissibly retrospective. (Pls. Mot. at 16-17.) The contested testimony was not offered to supplement or cure a defective IEP, but to explain or justify the CSE's decision not to complete a formal evaluation. See R.E., 694 F.3d at 186-87 ("While testimony that materially alters the

written plan is not permitted, testimony may be received that explains or justifies the services listed in the IEP.").

### 4. Behavioral Needs

Plaintiffs also premise their reimbursement claim on the CSE's alleged failure to develop an appropriate BIP for G.K. (Pls. Mot. at 17-19.) The IDEIA requires that in generating an IEP for "a child whose behavior impedes the child's learning," the CSE must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i); see also A.C., 553 F.3d at 172. The resulting BIP is based upon an FBA, which will identify and define the problem behaviors in concrete terms, identify the contextual factors that contribute to those behaviors, and formulate a theory as to the conditions in which they occur, their function, and the consequences that serve to maintain them. See N.Y. Comp. Codes R. & Regs. tit. 8 § 200.4(b)(1)(v). Plaintiffs do not contest that the CSE developed both an FBA and BIP for G.K. during the IEP meeting. Instead, they argue that the proposed BIP was inappropriate, as it was "vague," "not based on any data," "failed to include baselines" or "any expected behavior changes," and that the "CSE failed to discuss the proposed BIP." (Pls. Mot. at 18.)

During the May 2011 CSE meeting, the Department's school psychologist prepared an FBA for G.K. based on information in Ms. Fuchs' on-site evaluation, progress reports from the student's therapists at RFTS, verbal input from the various RFTS individuals who participated in the CSE meeting, and Dr. Fiorile's April 2011 education service report. (SRO Op. at 20; Record at 1068 (FBA).) The FBA indicated that G.K.'s disruptive behaviors include "body tensing, flopping, crying, vocal protests, and biting his clothing," and identified the immediate antecedents to such behaviors, the setting in which they occurred, relevant background

information, and several possible explanations for their function. (Id.; id. at 1051 (identifying additional maladaptive behaviors, including aggression and non-contextual speech); see also SRO Op. at 20 (summarizing relevant portions of FBA).) Based on the FBA, the CSE concluded that G.K.'s maladaptive behaviors interfered with his learning and accordingly developed a BIP to ensure he received the "highly intensive supervision" he required. (Record at 1051.) The BIP set out three behavioral goals for G.K. to achieve over the course of his 2011-2012 school year, including that he seek an adult's help when frustrated, that he be better prepared to transition between activities and therefore minimize related frustration, and that he use a "tension ball" instead of biting his clothing. (See Record at 1067 (BIP).) To achieve those ends, the BIP set forth an array of strategies and supports to be employed by his instructors in the 6:1:1 program, including: positive and immediate reinforcement of appropriate behavior; short, high interest activities; structured socialization; a small, structured academic environment; a predictable routine; redirecting his attention; and individual paraprofessional support, among others. (Id.; see also SRO Op. at 20 (summarizing relevant strategies and supports).) The IEP also identified G.K.'s teachers, related service providers, and the designated 1:1 paraprofessional as being responsible for providing the required support. (Record at 1051, 68.)

As a preliminary matter, the SRO rightly rejected Plaintiffs' argument that the BIP was not "based on any data." (Pls. Mot. at 18.) New York regulations require that an FBA be "based on multiple sources of data including, but not limited to, information obtained from direct observation of the student, information from the student, the student's teacher(s) and/or related service provider(s), a review of available data and information from the student's record and other sources including any relevant information provided by the student's parent." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.22(a)(2). Here, the FBA plainly meets this requirement. As

previously noted, G.K's FBA (and thus his BIP) was predicated on verbal and written assessments by RFTS staff, progress reports from G.K.'s therapists, and the on-site observations of both Ms. Fuchs and Dr. Fiorile, who is a certified behavioral analyst. Even if information on how G.K.'s behavior manifested in a 6:1:1 environment versus a 1:1 environment would have been the ideal data set on which to generate his FBA in light of the CSE's program recommendation (see Tr. at 329-30), such information was not available to the CSE and the court finds no fault with the SRO's conclusion that "the results of the FBA were commensurate with the information about the student's behaviors provided to the CSE." (SRO Op. at 21; see also Tr. at 366-67 (RFTS shared the "information that was crucial" to G.K. and his interfering behaviors); id. at 101-02 (Fuchs testimony that behavioral impediments in other contexts remain useful in developing FBA); id. at 328-31.) Plaintiffs' argument concerning the absence of "data" underlying the FBA/BIP therefore is without merit.

The court likewise rejects Plaintiffs' contention that the "CSE failed to discuss the proposed BIP." As the SRO aptly noted, Ms. Wasserman testified that the CSE participants discussed G.K.'s maladaptive behaviors with her (SRO Op. at 21 n.12; Tr. at 328-31), and Ms. Fuchs similarly testified that the FBA was discussed and developed during the May 2011 meeting (Tr. at 53-54.) Indeed, the only evidence cited by Plaintiffs is Ms. Wasserman's testimony that she did not recall whether the FBA or BIP were discussed when she was on the phone. (Pls. Mot. at 18.) Based on the hearing record, the court believes the SRO's decision to reject this argument was supported by a preponderance of the relevant evidence and should not be disturbed.

For similar reasons, the SRO rejected Plaintiffs argument that the BIP is "too vague" to be appropriate to G.K. (Pls. Mot. at 18.) According to the SRO's opinion, the BIP detailed the

behaviors in question, identified environmental triggers that bring on the disruptive behaviors and the contexts in which they occur, and laid out specific strategies and supports to be employed in mitigating them. (SRO Op. at 21.) Further, a careful review of Ms. Wasserman's testimony on this issue, which is the only evidence cited by Plaintiffs, illustrates that her overriding objection to the BIP was that she believed his behaviors could be best addressed in a 1:1 environment. (Tr. at 331.) It appears that this was the same reason RFTS's staff did not provide G.K.'s then-current BIP to the CSE team. (Tr. at 328-30.) As discussed in more detail with regard to Plaintiffs' substantive objections to the proposed placement, see infra at Part III.C.1, and after reviewing the evidence cited by both parties, the court concurs in the SRO's reasoned judgment that the BIP prepared in conjunction with G.K.'s IEP "provided sufficient information to advise district staff about the student's problematic behaviors and strategies to manage them." (SRO Op. at 21.)[11]

In sum, based on its independent review of the evidence and the well-reasoned decision of the SRO, the court concludes that Plaintiffs' contention that the CSE failed to consider

---

[11] Plaintiffs' remaining challenges to the FBA and BIP likewise are rejected. First, the BIP plainly includes "expected behavioral changes," as three behavioral goals for G.K. are listed under the heading "WHAT BEHAVIOR CHANGES ARE EXPECTED?" (Record at 1067 (BIP).) Second, Plaintiffs argument that the BIP does not include adequate "baselines" also fails. (Pls. Mot. at 18.) The regulations require that a BIP include a "baseline measure of the problem behavior, including the frequency, duration, intensity and/or latency of the targeted behaviors." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.22(b)(4)(i). However, as previously noted, in addition to describing G.K.'s maladaptive behaviors and detailing the strategies and supports the Department would use to mitigate them, the FBA/BIP also provided information on the immediate antecedents to the student's problematic behaviors, indicated the contexts in which such behaviors occur, set out the consequences of those behaviors, and outlined several possible functions of the problematic behavior. (Record at 1068 (FBA); see also id. at 1051 (providing additional baseline information on G.K.'s behaviors).) Plaintiffs fail to argue or otherwise establish why these details fail to meet the requirements of § 200.22, nor can the court locate evidence in the record that might support such a position. Third, Plaintiffs do not provide any legal or factual support for their position that the BIP's purported failure to list each and every maladaptive behavior renders it inappropriate. (Pls. Mot. at 18.) Even if this were the case, the SRO concluded after a thorough and well-reasoned analysis that the BIP was appropriate and Plaintiffs have not given the court any cause to depart from that finding. Finally, the court rejects Plaintiffs' contention that the BIP could not be implemented at the proposed placement. See infra at Part III.C; see also R.E., 694 F.3d at 195 ("Speculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement.").

appropriate behavioral supports for G.K. is not supported by the hearing record and cannot support a claim for tuition reimbursement under the IDEIA.

5.     Parental Training and Counseling

Finally, Plaintiffs fault the May 2011 IEP for failing to provide for parental counseling and training. (Pls. Mot. at 19-20.) The Department does not dispute that the IEP is procedurally defective in this regard. (Def. Mot. at 23.) Nevertheless, relying on recent Second Circuit precedent, the SRO concluded "that the district's failure to incorporate parent counseling and training into the May 2011 IEP, while such was a violation of State regulation, did not rise to the level of a denial of a FAPE to the student." (SRO Op. at 22-23.) Based on the testimony of Ms. Henry, the SRO also found that the district was willing and able to provide the required services to the Parents.[12] (Id.) Given the clear law on this issue, the court concurs in the SRO's determination.

New York law requires that an IEP provide for counseling and training for the parents of autistic children. See R.E., 694 F.3d at 190 (citing N.Y. Comp. Codes R. & Regs. Tit. 8, § 200.13(d)). This counseling is intended to "assist[] parents in understanding the special needs of their child; provid[e] parents with information about child development; and help[] parents to acquire the necessary skills that will allow them to support the implementation of their child's individualized education program." Id. However, the Second Circuit has been clear that the failure to include parent counseling and training in an IEP is itself insufficient to establish the

---

[12] Plaintiffs also challenge the SRO's reliance on Ms. Henry's testimony, which they characterize as improper attempt by the Department to "cure" the deficiency in the IEP with "retrospective testimony." (Pls. Mot. at 19.) But the Department does not contest that a deficiency exists, and even if the Plaintiffs were correct that Ms. Henry's testimony was impermissibly retrospective, the outcome remains the same. The case law is clear: Without more, a CSE's failure to provide for parent counseling and training is itself insufficient to constitute the denial of a FAPE. See R.E., 694 F.3d at 190. In the court's view, it need not reach the question of whether the SRO's reliance on Ms. Henry's testimony was or was not permissible, as it would have no effect on its ultimate decision that this particular deficiency, standing alone, does not entitle Plaintiffs to reimbursement.

denial of a FAPE. See R.E., 694 F.3d at 191 ("Though the failure to include parent counseling in the IEP may, in some cases (particularly when aggregated with other violations), result in a denial of a FAPE, in the ordinary case that failure, standing alone, is not sufficient to warrant reimbursement."); E.F., 2013 WL 4495676, at *21; FB v. New York City Dep't of Educ., 923 F. Supp. 2d 570, 585 (S.D.N.Y. 2013) ("Thus, while a failure to provide parent counseling and training may—in combination with other deficiencies—contribute to denial of a FAPE, it alone is insufficient to rise to the level of denial thereof." (internal citation omitted)). As explained by the Second Circuit in R.E., this deficiency is mitigated by the fact that state regulations already require school districts to provide parent counseling for parents of autistic children; school districts therefore "remain accountable for their failure to do so no matter the contents of the IEP." R.E., 694 F.3d at 191.

Thus, while the omission of parent counseling and training is a technical deficiency in the May 2011 IEP, the court concurs in the SRO's logical and persuasive judgment that, based on the facts of this case and prevailing law, it did not result in the denial of a FAPE.

### 6. Cumulative Procedural Errors

The minor procedural violations identified in the preceding sections are insufficient to render the May 2011 IEP inappropriate, even when considered cumulatively. See R.E., 694 F.3d at 191 ("[Even minor [procedural violations] may cumulatively result in a denial of a FAPE.") Based on the preceding discussion, the court has identified two deficiencies in the IEP: (1) the omission of parent counseling and training, and (2) the omission of express evaluative criteria in two of the IEP's seventeen goals. See supra at Parts III.B.2 & III.B.5. But as previously discussed, the first error is mitigated by the Department's background legal obligation to provide such services and the second is insufficient to establish the "loss of educational opportunity" or

32

the infringement of the Parents' "participation in the creation or formulation of the IEP" when considered against the remaining goals and objectives, much less the IEP as a whole. E.C. v. Bd. of Educ., No. 11-CV-9429 (ER), 2013 WL 1091321, at *19 (S.D.N.Y. Mar. 15, 2013); Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005). These minor technical deficiencies therefore do not, as the SRO rightly held, amount to the denial of a FAPE when considered cumulatively. See, e.g., E.F., 2013 WL 4495676, at *23-25 (holding that absence of parent counseling and deficiencies in some goals were "procedural errors of 'form over substance' and did not render the IEP legally inadequate under the IDEA as they did not rise to the level . . . warranting a conclusion that the IEP was fundamentally deficient" (citation omitted)); FB, 2013 WL 592664, at *13 (finding lack of parent counseling and other procedural errors did not warrant finding denial of a FAPE, as they were "more formal than substantive"); see also R.E., 694 F.3d at 193 (concluding that IEP's failure to provide for parent counseling and deficiencies in FBA did not cumulatively amount to violation of IDEIA).

## C.    The May 2011 IEP Is Substantively Appropriate

Having determined that the May 2011 IEP was procedurally adequate, the court turns to the substantive adequacy of the IEP and considers whether it was "reasonably calculated to enable the child to receive educational benefit[s]." R.E., 694 F.3d at 190 (quoting Rowley, 458 U.S. at 206–07). The IDEIA's substantive requirements are met when the IEP "'is likely to produce progress, not regression' and 'affords the student . . . an opportunity greater than mere trivial advancement." E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist., 487 F. App'x 619, 621 (2d Cir. 2012) (quoting Cerra, 427 F.3d at 195). Failure to meet this standard automatically entitles the Parents to reimbursement under the IDEIA. See R.E., 694 F.3d at 190. Yet, as decisions on substantive adequacy implicate educational policy judgments, administrative determinations on these matters are entitled to a greater degree of deference by the court. See

33

M.H., 685 F.3d at 244 ("[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures.").

> 1. 1:1 Program v. 6:1:1 Program

At its core, the Parents' objections to the May 2011 IEP revolve around their firmly held belief that G.K. requires intensive 1:1 instruction of the type he received at RFTS, rather than the 6:1:1 program recommended by the CSE. To wit, they argue that the SRO's determination that "the record does not suggest that [G.K.] required an intense ABA program on a 1:1 basis in order to receive education benefits"—which affirmed the IHO's findings below—was erroneous, poorly reasoned, and deserving of reversal. (Pls. Mot. at 21; see SRO Op. at 15; IHO Op. at 31.) While the court sympathizes with the Parents' desire to see their son educated in the environment they feel best suits his needs, the court nonetheless concludes that, based on the hearing record below, the 6:1:1 program prescribed in the May 2011 IEP was substantively adequate to provide a FAPE.

It is important to note that while the IDEIA guarantees that each child be afforded a FAPE, it "does not guarantee that the 'district provide [] everything that might be thought desirable by loving parents.'" D.B. ex rel. K.B. v. New York City Dep't of Educ., No. 10-CV-6183, 2011 WL 4916435, at *12 (S.D.N.Y. Oct. 12, 2011) (quoting Walczak, 142 F.3d at 132). Nor must a CSE furnish "every special service necessary to maximize each handicapped child's potential." B.P. v. New York City Dep't of Educ., 841 F. Supp. 2d 605, 614 (E.D.N.Y. 2012) (quoting Rowley, 458 U.S. at 199). Instead, when reviewing an IEP's substantive adequacy, the court is mindful that the IDEIA prescribes a "basic floor of opportunity consisting of services that are individually designed to provide educational benefit to a child with a disability." Grim,

346 F.3d at 379 (internal quotation marks omitted); see also Rowley, 458 U.S. at 201 (IDEA provides for a "basic floor of opportunity . . . consist[ing] of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child.").[13]

The testimony adduced before the IHO revealed the stark disagreement among the parties' respective experts as to whether a 6:1:1 environment was appropriate for G.K. For example, the Assistant Director at RFTS, Ms. Wasserman, testified that G.K. had made progress in acquiring various skills at RFTS and "still require[d] the 1:1 instruction to help work on reduction of maladaptive behaviors" and to redirect him when necessary. (Tr. at 285-86; see also id. at 498-99, 513-14 (Ms. Barnett of RFTS also testified that G.K. required a "data-driven" 1:1 program).) Dr. Fiorile, the Parents' behavioral expert, similarly testified that G.K.'s disruptive behaviors required "an intense ABA program on a 1:1 basis." (Tr. at 414-15; see also id. at 406-07.) By contrast, Ms. Fuchs, the district representative and special education teacher who evaluated G.K. at RFTS prior to the CSE meeting, testified that G.K. "seemed to have the ability to learn" but was being "stifled" by RFTS's restrictive 1:1 program. (Id. at 115-16.) In her view, the controlled 1:1 program inhibited G.K.'s creative, communicative, and academic development. (Id.) Ms. Fuchs also testified that while G.K. may require 1:1 instruction for certain therapies (e.g., Speech, OT, etc.), a full-time 1:1 program would be "hurtful" because it deprived him of the opportunity to develop essential socialization skills through the direct observation of and interaction with other students. (Id. at 47, 55-56, 108-09.) Though Plaintiffs contest this characterization of the RFTS program, the record reflects that so-called "group"

---

[13] The Department repeatedly notes that the Parents did not object to the recommended program at the CSE meeting in May 2011. (See Def. Mot. at 3, 8, 26; see also IHO Op. at 31.) However, the court sees no legal or logical requirement that they have done so in order to challenge the proposed IEP in a subsequent due process complaint. Accordingly, the mere fact that the Parents did not formally object to the IEP at the CSE meeting does not factor into the court's analysis.

activities at RFTS invariably occurred within the strict 1:1 regime. (Id. at 47, 95-96, 111, 287-89.)

Based on their respective evaluations of the hearing record, both the IHO and SRO reasonably concluded that the 6:1:1 program would be a substantively appropriate placement for G.K. Relying on the testimony of Ms. Fuchs and other record evidence, the IHO determined that G.K.'s behavioral issues did not justify "continuing a program that is isolating and controlled"—referring to the "extraordinarily restrictive" RFTS 1:1 program—and that he should instead be "transitioned to a program that offers academics and socialization," as argued by the district representative. (IHO Op. at 31.) The IHO reasoned that a 6:1:1 program with full-time 1:1 paraprofessional support and individualized related services was substantively appropriate for G.K., notwithstanding his significant, though not atypical, behavioral issues. (Id.) In the IHO's view, G.K. had demonstrated a capacity to begin academic instruction and would likely benefit from increased socialization opportunities, which were not sufficiently available at RFTS. (Id.) Based on its review of the evidence, the IHO concluded that the Department had credibly shown the 6:1:1 program to be appropriate for G.K. (Id.) The SRO agreed. Affirming the decision below, the SRO determined that the hearing record did not support Plaintiffs' position that G.K. could only make progress in a 1:1 environment. (SRO Op. at 15-16.) Rather, the SRO concluded that the record illustrated that IEP's provision of a 6:1:1 program and designated 1:1 health paraprofessional, along with daily related services provided on an individualized basis, was substantively adequate to provide a FAPE. (Id.)

The court likewise is unconvinced by Plaintiffs' argument that G.K.'s behavioral needs render the IEP's recommendation of a 6:1:1 program inappropriate. In addition to the base 6:1:1 educational program, which is designed for students who "require[e] a high degree of

individualized attention and intervention," N.Y. Comp. Codes R. & Regs. tit. 8, §

200.6(h)(4)(ii)(a), the IEP also provided for full-time 1:1 support from a designated health

paraprofessional and twelve 1:1 therapy sessions per week. (Record at 1066 (IEP); SRO Op. at

16.) Plaintiffs contend this degree of 1:1 instruction is inadequate, especially as the health

paraprofessional "could not provide G.K. with the *instructional* support he requires" and instead

would assist only with health-related needs such as toilet training. (Def. Mot. at 22-23 (emphasis

in original).) Yet a paraprofessional, by definition, "provides instructional support" to the

student to which he or she is assigned. 34 C.F.R. § 200.58; see also N.Y. Comp. Codes R. &

Regs. tit. 8, § 120.6. (But see Tr. at 178.) Indeed, the IEP plainly contemplates the

paraprofessional providing G.K. with in-class instructional support, in addition to assisting him

with toileting and lunchroom tasks. The IEP provides that G.K.'s paraprofessional will assist

him in completing the teacher's assignments, and the BIP identifies the paraprofessional as

someone who will assist in implementing the BIP and managing G.K.'s maladaptive behaviors.

(Record at 1059, 1067.) Based on the record before it, the SRO reasonably concluded that the

"instructional and behavioral support" provided by the paraprofessional would be sufficient to

meet the student's behavioral needs "such that placement in a full-time 1:1 educational setting

was not warranted in order for the student to receive a FAPE. (SRO Op. at 16, 21, 26; see also

IHO Op. at 31-32.)

Presented with the competing opinions of the parties' respective education professionals

concerning the appropriateness of a 6:1:1 program for G.K., the court defers to the professional

judgment of the SRO, whose well-reasoned and persuasive determination in the Department's

favor was suitably supported by the hearing record. Deference is particularly appropriate with

regard to SRO's finding that the IEP's prescribed 6:1:1 program with 1:1 paraprofessional

support was sufficient to address G.K.'s behavioral needs. See R.E., 694 F.3d at 192 ("The adequacy of 1:1 paraprofessional support as opposed to 1:1 teacher support is precisely the kind of educational policy judgment to which we owe the state deference if it is supported by sufficient evidence . . . ."); D.J. v. New York City Dep't of Educ., No. 12-CV-7009, 2013 WL 4400689, at *5 (S.D.N.Y. Aug. 15, 2013) ("[C]lass size and student-teacher ratios 'involve questions of methodology more appropriately answered by the state and district decision-makers' than by federal judges." (citation omitted)); see also F.L. ex rel. F.L., No. 12-4575-CV, 2014 WL 53264, at *5 (2d Cir. Jan. 8, 2014); D.A.B., 2013 WL 5178267, at *13. Both administrative officers plainly appreciated G.K.'s individual developmental and behavioral needs, and reasonably concluded based on the same record before the court that the IEP's recommended program was likely to result in progress, rather than regression, and afforded G.K. with important educational benefits in the areas of academic instruction and socialization. That a more restrictive 1:1 program may also have been appropriate for the student is immaterial. See E.F., 2013 WL 4495676, at *15 (noting that once the CSE found a 6:1:1 program appropriate, it was not required to consider a more restrictive program).

The court accordingly finds the SRO's decision in this regard was both thorough and premised on the officer's expertise and educational judgment, and does not find sufficient evidence in the hearing record to support the Parents' contrary assertion that a 6:1:1 program with designated paraprofessional support was inappropriate for their son.

2.      Objections to Proposed Placement

Finally, Plaintiffs maintain that the proposed placement offered by the Department was substantively inadequate to meet G.K.'s needs. (Pls. Mot. at 23-27.) Specifically, they argue that (1) G.K. would not have been functionally grouped at P4, (2) P4's staff was inadequately

38

trained to provide proper behavioral intervention, and (3) P4 lacked sensory equipment required by G.K. (Id.) However, because an IEP is to be evaluated based on "the written plan offered to the parents," "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement." R.E., 694 F.3d at 195; M.S. v. New York City Dep't of Educ., No. 12-CV-3533 NG, 2013 WL 7819319 (E.D.N.Y. Nov. 5, 2013). "[T]he appropriate forum for such a claim is 'a later proceeding' to show that the child was denied a free and appropriate public education 'because necessary services included in the IEP were not provided in practice.'" F.L. ex rel. F.L., 2014 WL 53264, at *6 (quoting R.E., 694 F.3d at 187 n.3). Plaintiffs' objections to the proposed placement were therefore appropriately denied by both the IHO and SRO. (See IHO Op. at 31-32; SRO Op. at 23-28.) To the extent these objections were based on the G.K.'s father's visit to P4 prior to the placement decision, and therefore arguably non-speculative, the SRO reasonably concluded that they were still unsupported by the hearing record. (SRO Op. at 24 ("Even assuming for the sake of argument that the student had attended [P4] . . . the hearing record does not support the conclusion that the district would have deviated from the student's IEP in a material or substantial way.").)

Plaintiffs' assertion that G.K. would not have been appropriately grouped at P4 is, by their own admission, predicated on the assumption that he would be placed in a particular class. (Pls. Mot. at 23 ("Assuming G.K. were placed in Ms. Williams' class, he would not have been appropriately grouped at P4.").) Yet the parties do not dispute that G.K. was never actually placed in Ms. Williams' or any other class at P4. (Tr. at 140-41, 169-71.) Plaintiffs' functional grouping argument therefore falls squarely within the realm of impermissible "speculative" objections to an unimplemented IEP, which the court need not and will not entertain as grounds for establishing the denial of a FAPE. See R.B., 2013 WL 5438605, at *17 ("Pursuant to Second

Circuit precedent, 'courts are prohibited from evaluating the adequacy of an unimplemented IEP based on evidence about the particular classroom in which a student would be placed.'") (quoting N.K. v. New York City Dep't of Educ., No. 12-CV-5038 (JMF), 2013 WL 4436528, at *11 (S.D.N.Y. Aug. 13, 2013)); see also R.E., 694 F.3d at 186-87; A.M., 2013 WL 4056216, at *13-14 ("[W]here a parent enrolls the child in a private placement before the time that the district would have been obligated to implement the IEP placement, the validity of proposed placement is to be judged on the face of the IEP, rather than from evidence introduced later concerning how the IEP might have been, or allegedly would have been, implemented."). Nonetheless, relying on Ms. Henry's testimony on the age and functional ranges of students' in Ms. Williams' class, the SRO reasonably concluded that G.K. would have been functionally grouped in Ms. Williams' class. (SRO Op. at 24-25.)

The court similarly will not assume that the staff at P4 lacked the training or experience necessary to implement the student's BIP. Even if such an allegation were not wholly speculative, the evidence adduced at the due process hearing, which the SRO carefully and thoughtfully considered, does not support such a finding. (SRO Op. at 26-27 ("[T]he evidence does not support a conclusion that staff at [P4] lacked the necessary experience and training to address the student's behavioral needs and would have deviated from the student's IEP in a material or substantive way.").) See also M.S., 2013 WL 7819319, at *16 (rejecting similar argument based on prospective teacher's "limited experience with autistic children" as "not relevant to determining the appropriateness of the IEP."). The SRO reasonably relied on the testimony of Ms. Henry, the lead teacher at P4, which outlined—albeit in broad strokes and often without precision—the experience of P4's teachers and paraprofessionals, the mandatory training and additional professional development programming afforded to P4 staff, and some of the

behavioral supports used most frequently at the school, among other topics. (Id.) Like the SRO, the court rejects Plaintiffs insistence the generic behavioral supports discussed by Ms. Henry somehow prove that staff at P4 were incapable or unwilling to appropriately implement G.K.'s individualized BIP. (Id.) The hearing record supports the contrary proposition. See supra at Parts III.B.4 & III.C.1.

Finally, the court concurs in the SRO's judgment that the proposed placement was capable of meeting G.K.'s sensory needs. (See SRO Op. at 27-28.) Plaintiffs argue that P4 was an inappropriate placement for G.K. because it lacked, among other things, "various suspended equipment" called for in the IEP. (Pls. Mot. at 26-27.) However, Plaintiffs are unable to show that the Department was unwilling or unable to obtain any equipment necessary for G.K.'s instruction under the IEP, should he have been enrolled at P4. To the contrary, as the SRO acknowledged, the record demonstrates that just the opposite was true. (See SRO Op. at 27; Tr. at 212-13.) The mere fact that Y.K. did not observe "various suspended equipment" when he visited P4 is insufficient to establish that the IEP would not have been properly implemented. See N.K., 2013 WL 4436528, at *13 ("The fact that Plaintiffs did not observe any sensory equipment on their site visit is insufficient to demonstrate that [the proposed placement] lacked such equipment or that the school would not obtain the equipment necessary to implement J.K.'s IEP should J.K. attend the school."); see also R.B., 2013 WL 5438605, at *16; Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ., No. 12-CV-2113 (WHP), 2012 WL 6136493, at *7 (S.D.N.Y. Dec. 11, 2012).

In sum, Plaintiffs' objections to the proposed placement are either impermissibly speculative or otherwise unsupported by the hearing record. The court defers to and concurs in the reasoned and persuasive determination of the SRO that the proposed placement would have

41

been substantively appropriate had G.K. been formally enrolled, and does not therefore provide adequate grounds to find denial of a FAPE.

## IV. CONCLUSION

For the reasons discussed above, Plaintiffs' motion for summary judgment is DENIED in its entirety and the Department's cross-motion is GRANTED. The court concludes that the May 2011 IEP was procedurally and substantively adequate under the IDEIA to provide G.K. with a free and appropriate public education. Having found no violation of the IDEIA, the court need not consider the remaining two steps of the Burlington/Carter inquiry. See A.C., 553 F.3d at 173.

The Clerk of Court is respectfully directed to enter judgment and close the case.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
       March 28 2014

NICHOLAS G. GARAUFIS
United States District Judge

# APPENDIX A

| Acronym | Meaning |
|---------|---------|
| ABA | Applied Behavior Analysis |
| BIP | Behavior Intervention Program |
| CSE | Committee on Special Education |
| FAPE | Free and Appropriate Education |
| FBA | Functional Behavioral Assessment |
| IEP | Individualized Education Program |
| IHO | Impartial Hearing Officer |
| OT | Occupational Therapy |
| PT | Physical Therapy |
| RFTS | Reach for the Stars Learning Center |
| SRO | State Review Officer |